Filed 12/22/23  In re E.H. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.H. et al., Persons Coming Under the Juvenile Court Law. | B328095 (Los Angeles County Super. Ct. No. 18CCJP06000B, D–H) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>M.M.,<br><br>        Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Gabriela H. Shapiro, Judge Pro Tempore.  Affirmed.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kimberly Roura, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

In this juvenile dependency appeal, M.M. (father) appeals the juvenile court's order terminating his parental rights to six of his children. Father raises one issue on appeal. He argues the juvenile court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with inquiry and notice provisions of the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law. Father seeks a conditional reversal of the juvenile court's orders terminating his parental rights and remand directing the juvenile court and the Department to comply with ICWA.

As discussed below, we conclude (1) although errors were made with respect to the Department's initial duty of inquiry as to father's side of the family, those errors were harmless and do not require remand, and (2) substantial evidence supports the juvenile court's ICWA finding as to mother's side of the family. Thus, we affirm.

## BACKGROUND

### 1. The Family

Father moved to the United States in 2006. He met I.M. (mother) in Indiana and later married her. At some point, they separated but continued to see each other. The status of their relationship was unclear. Mother and father have seven children together, two of whom (twins) were born during the pendency of

2

the underlying proceedings.[1]  Mother also has one child from a different relationship (half sibling).  Mother, half sibling, and one of mother and father's older children are not parties to this appeal, although each was involved in the proceedings below.

Father's parents and most of his siblings live in Guatemala.  Two of his brothers, however, Henry and Boris (paternal uncles), live in Los Angeles.  While the underlying proceedings were pending, father was at times incarcerated, living with paternal uncles, or living with a friend.

Mother has nine siblings, all of whom, along with mother's mother (maternal grandmother), live in Indiana.  Mother stayed in contact with maternal grandmother and all her siblings.  Mother has no contact with her father (maternal grandfather).  Mother's support system included her sister Trina (maternal aunt) and brother Timothy (maternal uncle).

## 2.  Brief Case Summary

Beside his ICWA arguments, father does not challenge the merits of the juvenile court's rulings.  Consequently, we include only a brief summary of them and the underlying facts here.  This case began in September 2018, when the Department filed a Welfare and Institutions Code section 300 petition on behalf of mother and father's older children (the twins were not yet born) and half sibling (petition).[2]  The petition alleged mother and father engaged in verbal and physical violence in the children's presence, father had been arrested for injuring mother with a

---

[1] Mother and father have two sets of twins.  In this opinion, "twins" refers to their two youngest children.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

3

knife and his fists, and father and mother had physically abused two of their children.  In July 2019, after the twins were born, the Department filed a similar petition on their behalf (twins' petition).  The juvenile court sustained amended petitions as to the children, all of whom were placed (some individually, some together) in foster homes.

On February 23, 2023, well over four years after the proceedings began, the juvenile court found the children were adoptable and likely to be adopted.  The court terminated mother's and father's parental rights to six of their children.  This appeal followed.

**3. Facts Relevant to ICWA**

**a. Contacts with Relatives**

During the pendency of the proceedings below, in addition to speaking with mother and father, Department social workers spoke with paternal uncle Boris, maternal grandmother, maternal uncle, and maternal aunt (who at various times expressed interest in having the children placed with her in Indiana).  The last contact the Department had with maternal aunt was in early 2021, when maternal aunt contacted the Department to inquire about the case.  In March 2022, the Department attempted to contact maternal aunt, but the phone number the Department had for her was disconnected.  The Department could not locate her.  Of those four relatives contacted, the Department asked only maternal grandmother and paternal uncle Boris about potential Indian ancestry.

By approximately late April 2020, the Department had lost contact with mother.  Almost one year later, in February 2021, mother stated she was with maternal aunt in Indiana.  Despite

4

efforts to maintain contact, the Department eventually lost contact with mother altogether.

### b. Father

Throughout the proceedings, father indicated he had no Indian ancestry. Paternal uncle Boris similarly denied Indian ancestry. At the September 2018 detention hearing regarding the petition, the juvenile court found it did not have a reason to know ICWA applied with respect to father's side of the family.

### c. Mother

#### i. *ICWA Inquiries and Findings as to the Older Children*

In connection with filing the petition in September 2018, the Department inquired of mother whether the children had Indian ancestry. For each child, the Department checked a box indicating, "The child has no known Indian ancestry." However, on her "parental notification of Indian status" form (ICWA-020) filed the next day, mother checked the box indicating she "may have Indian ancestry," specifically Cherokee.

At the September 2018 detention hearing, the juvenile court asked mother whether any member of her family was enrolled or registered with a Cherokee tribe. Mother responded, "No," but also stated her grandmother (maternal great grandmother) "was Indian Cherokee." Mother did not know if maternal great grandmother was registered. The court ordered the Department to investigate mother's claim of potential Indian ancestry and to file a report, which was to include "the details of who was interviewed, dates and places of birth of the relatives as far back as can be ascertained." The court also ordered the Department "to notice the Bureau of Indian Affairs, the Secretary

5

of Interior and the appropriate tribes," and to submit those notices, return receipts, and any responses.

In its November 2018 jurisdiction and disposition report, the Department stated, "The Indian Child Welfare Act does or may apply." The Department noted mother and maternal grandmother indicated maternal great grandmother (who was no longer alive) "has Black Indian Cherokee heritage." Maternal grandmother "did not know if [the maternal great grandmother] was a registered member or received any services from the tribe."

Also in November 2018, the Department sent ICWA notices (form ICWA-030) to mother, father, the Bureau of Indian Affairs, the Department of the Interior, the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians, and the United Keetoowah Band of Cherokee Indians (2018 notices). Those notices included the name, birthdate and birthplace for each of the older children (the twins were not born yet), mother, father, maternal grandmother, and maternal great grandmother. The 2018 notices indicated maternal grandmother and maternal great grandmother had Black Indian Cherokee heritage, while mother had "Possible Black Indian Cherokee" heritage. Mother and maternal grandmother were listed as "Not a member" of a tribe, and maternal great grandmother was listed as "Unknown" if she was a member of a tribe or received any services from a tribe. The notices stated, "Mother reported maternal great grandmother said 'there's a little Cherokee in all of us' referring to the maternal family bloodline. Maternal grandmother reported the details of the family's Native American heritage were not discussed with her." Very limited information was included regarding maternal grandfather because mother had no contact with him. The 2018 notices indicated father had no

known Indian heritage and his parents and grandparents were born and lived in Guatemala.

In December 2018, the Eastern Band of Cherokee Indians wrote to the Department, stating the children were "neither registered nor eligible to register as a member of this tribe" and each child was "not considered an 'Indian Child' in relation to the Eastern Band of Cherokee Indians as defined in 25 U.S.C., Section 1903(4)." The tribe would not intervene in the matter. By late February 2019, the Department had not received responses from the other two tribes, although they, the Department of the Interior and Bureau of Indian Affairs each had received the 2018 notices.

At the February 26, 2019, disposition hearing as to the older children, counsel for the Department stated the Department had received "the ICWA notices back" (referring to return receipts indicating the 2018 notices were received by their intended recipients) and "[t]hey are attached to today's last minute [report]." At that hearing, the juvenile court found "No ICWA." Although that finding is reflected in the reporter's transcript for the hearing, it is not reflected in the court's minute orders from the hearing. However, mother's and father's case plans state ICWA does not apply, which case plans were incorporated into the February 26, 2019 minute orders.

### ii. ICWA Inquiries and Findings as to the Twins

In connection with the twins' petition filed in July 2019, the Department checked the box that the twins "may have Indian ancestry." The Department noted mother "declined to state or sign ICWA form" at the time. The next day, however, mother submitted an ICWA-020 form, on which she checked the box

7

stating, "I have no Indian ancestry as far as I know." At the July 16, 2019 detention hearing on the twins' petition, the court stated it did not have reason to know the twins were Indian children, and did not order notice to any Indian tribe or the Bureau of Indian Affairs. Similarly, in its October 2019 minute order for the twins' disposition hearing, the juvenile court stated "No ICWA."

### iii. Subsequent ICWA Discussions, Notices, and Findings as to the Children

In a January 2021 report regarding the three youngest children, and although the juvenile court had already found ICWA did not apply, the Department stated the court's ICWA findings as to mother were still pending with respect to the older children. The Department requested the court to make its ICWA findings. The Department reiterated this request in September and November 2021 filings.

In a September 2021 report, the Department stated, "On 07/16/19, the Court found that the Indian Child Welfare Act does not apply for the minors, [twins]. [¶] Given that the Indian Child Welfare Act was found not to apply for the minors, [twins,] [t]he Department respectfully recommends for the Court to find that the Indian Child Welfare Act does not apply as [to mother] for the [six older] minors." The Department repeated this in March and April 2022 reports.

At a permanency planning hearing held in March 2022, counsel for the Department asked the juvenile court to find ICWA did not apply to the older children. Counsel noted the Cherokee tribe previously had stated the children were not eligible for membership and, "subsequently at the disposition hearing [the court] proceeded as if the case was not ICWA. So I believe it

8

appears to have just been an oversight on the part of the court to not make the formal ICWA findings on the record." The court declined to make an ICWA order at that time, however, stating, "[I]f at the start of a case a member of the family mentions a Native American tribe, even if the tribe has already responded, the court and the Department have an obligation to re-notice the tribe for the .26 hearing, and at the very least, inquire if they wish to intervene or if there is any additional information, at the time of the .26." The court believed that the scheduling of a permanency planning hearing may "trigger" a tribe that previously declined to intervene "to determine that they do want to participate. [¶] . . . I would just assume [*sic*] have all of this addressed before proceedings to a .26 hearing, and have the Department notify the Cherokee Nation." The court stated, "[I]n the ICWA statutes, it's an obligation to re-notice the tribes before the .26 in every instance when a tribe may be mentioned at an initial hearing, even if the tribes don't intervene and ICWA does not apply, especially where tribes may not have responded to initial inquiries. Here, we have the Eastern Band responding to an initial inquiry, but the court is obligated to revisit ICWA at every .26 hearing. [¶] And, so, perhaps in an attempt to ensure that the tribe is aware that the case is at a .26 hearing, I would ask that the Department [inform the tribes] that we are proceeding with a .26 hearing." Counsel argued repeat notice was not required "once . . . the tribe has indicated that the children are not eligible for membership."

Thus, although at the March 2022 hearing the juvenile court found "[n]o reason to know the ICWA applies," the court also ordered the Department "to send notices to the Eastern

9

Band of Cherokee Nations Tribe as to the .26 hearing despite their prior response."

In late June 2022, the Department sent by certified mail ICWA notices (form ICWA-030) on behalf of each child, including for the first time the twins, to mother, father, the Bureau of Indian Affairs, the Department of the Interior, and the Eastern Band of Cherokee Indians (2022 notices). The Department referred to these as "courtesy ICWA notices for the WIC 366.26 hearing." These 2022 notices indicated the children may be eligible for membership in the "Cherokee – Eastern Band of Cherokee Indians" tribe. Unlike the 2018 notices, however, the 2022 notices did not include information regarding relatives other than mother and father, and the information related to mother and father was sparse and outdated. The 2022 notices were not sent to the Cherokee Nation of Oklahoma or to the United Keetoowah Band of Cherokee Indians. Based on the 2022 notices, the Eastern Band of Cherokee Nations tribe determined the children were neither registered nor eligible to register as members of the tribe.

In January 2023, the juvenile court continued the permanency planning hearing again in part so that the Department could conduct a "full ICWA inquiry." The court ordered the Department "to review their case file and provide a list of all extended family members and relatives that the agency has had contact with over the course of the case and evidence that ICWA inquiry was made of all of those individuals. That evidence should be included with the report submitted for the 26 hearing. [¶] In addition, if [the Department] determines there are relatives or extended family members who have not yet been

10

interviewed, [the Department] is to do so forthwith and comply with its ongoing ICWA obligations pursuant to CRC 5.481(a)(5)."

The next month, in February 2023, the Department reported it left multiple voicemail messages for mother and for maternal uncle asking them to call back. They did not. The Department also reported it had attempted to contact maternal aunt, but her phone number was no longer in service. A Department social worker spoke with father, who stated he had no Indian ancestry and "mother had never mentioned having Indian ancestry or being [a] member of a tribe." The social worker also spoke with paternal uncle Boris, who stated he had no information that the children had Indian ancestry. The Department did not contact maternal grandmother.

The permanency planning hearing was held on February 23, 2023, more than four years after the underlying proceedings began. At the hearing, the court asked the attorneys present if they were "in agreement with the [Department's] representation that the ICWA inquiry appears to be a complete, cohesive list of all relatives and their response to ICWA?" Each attorney was in agreement. The court found "the ICWA inquiry is complete. The Department has made diligent efforts to investigate and inquire of all known relativ[es] or non-related extended family members, and anyone with an interest in the child." The court held, "The children are not Indian children, and the Indian Child Welfare Act does not apply to them."

## DISCUSSION

### 1. Applicable Law

ICWA establishes minimum standards courts must follow before removing an Indian child from his or her family. Under California law implementing ICWA, the juvenile court and the

11

Department "have an affirmative and continuing duty to inquire whether" a dependent child "is or may be an Indian child." (§ 224.2, subd. (a); *In re Austin J.* (2020) 47 Cal.App.5th 870, 883.) For these purposes, an " 'Indian child' " is a child who (1) is "a member of an Indian tribe," or (2) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a) [adopting federal law definition].)

Under ICWA as implemented in California, "the Department and juvenile court have 'three distinct duties.' [Citations.] The first duty is the initial 'duty' of the Department and the juvenile court 'to inquire whether [a] child is an Indian child.' (§ 224.2, subds. (a) & (b).) The Department discharges this duty chiefly by 'asking' family members 'whether the child is, or may be, an Indian child.' (*Id.*, subd. (b).) This includes inquiring of not only the child's parents, but also others, including but not limited to, 'extended family members.'[3] (*Ibid.*) For its part, the juvenile court is required, '[a]t the first appearance' in a dependency case, to 'ask each participant' 'present' 'whether the participant knows or has reason to know that the child is an Indian child.' (*Id.*, subd. (c).)" (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578 (*Dezi C.*).)

"The second duty is the duty of the Department or the juvenile court to 'make further inquiry regarding the possible

---

[3] "Extended family members" include the dependent child's adult "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c) [adopting federal law definition].)

12

Indian status of the child.' ([§ 224.2], subd. (e).)  This duty of further inquiry is triggered if the Department or court 'has reason to believe that an Indian child is involved' because the record contains 'information . . . suggesting the child is Indian' (*ibid.*; [citations]), and, once triggered, obligates the Department to conduct further interviews to gather information, to contact the Bureau of Indian Affairs and state department of social services for assistance, and/or to contact the relevant Indian tribe(s).  (§ 224.2, subd. (e)(2).)"  (*Dezi C.*, *supra*, 79 Cal.App.5th at pp. 780–781, rev.gr.)  This further inquiry must be made "as soon as practicable."  (§ 224.2, subd. (e).)  "Contact" for purposes of further inquiry does not require the sharing of significant and detailed information on a child's grandparents, great-grandparents, and other direct lineal ancestors.  (Compare § 224.2, subd. (e) with §§ 224.2, subd. (f), and 224.3, subd. (a)(5)(C).)  However, of course, biographical information that is accurate and as complete as possible is necessary for the tribes to make a determination as to a child's tribal status.

"The third duty is the duty to notify the relevant Indian tribe(s).  (§ 224.3, subd. (a); 25 U.S.C. § 1912(a).)  This duty is triggered if the Department or the court 'knows or has reason to know . . . that an Indian child is involved.'  (§ 224.3, subd. (a).)" (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 781, rev.gr.)  "[T]he duty to provide notice to Indian tribes applies only when one knows or has a 'reason to know . . . an Indian child is involved,' and only 'for hearings that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement, or adoptive placement.'  (§ 224.3, subd. (a).)"  (*In re Austin J.*, *supra*, 47 Cal.App.5th at p. 884.)  For these purposes, a "reason to know" exists when the juvenile court has been

informed of any of the following: (1) the child is an Indian child, (2) the child or parents live on a reservation or in an Alaska Native village, (3) information indicating that the child is an Indian child, (4) the child gives the court reason to know he or she is an Indian child, (5) the child is or has been a ward of a tribal court, or (6) the child or either parent has an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).) When there is a reason to know an Indian child is involved, notices must comply with formal statutory requirements. (§ 224.3, subd. (a).)

## 2. Standard of Review

" '[W]e review the juvenile court's ICWA findings under the substantial evidence test, which requires us to determine if reasonable, credible evidence of solid value supports' the court's ICWA finding." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.) Even if substantial evidence does not support the juvenile court's ICWA findings, we may not reverse unless we find that error was prejudicial. (Cal. Const., art. VI, § 13; *Dezi C.*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.)

## 3. Application

First, we address ICWA compliance as to father's side of the family. We agree with father that the Department did not satisfy its duty of inquiry. Although the Department spoke with father and paternal uncle Boris, the Department never contacted father's other brother, paternal uncle Henry, with whom paternal uncle Boris and father for a time lived in Los Angeles. There is also no indication the Department attempted to contact any of father's family members who lived in Guatemala. Thus, the Department failed to satisfy its initial duty of inquiry as to father's side of the family because it did not contact, or even

14

appear to try to contact, extended family members. (Welf. & Inst. Code, § 224.2, subd. (b); 25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).)

Given this error, we must consider whether it was prejudicial and requires remand. (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 777, rev.gr.) The record below does not contain information suggesting a reason to believe the children may be "Indian children" based on father's ancestry. (*Id.* at p. 779.) Father consistently denied Indian heritage. Paternal uncle Boris similarly denied Indian heritage. Father makes no proffer on appeal to change this assessment. (*Ibid.*) Thus, we conclude the error was harmless and remand is not warranted based on the inquiry error as to father's side of the family. (*Id.* at p. 786.)

Second, we address ICWA compliance as to mother's side of the family. As with father's family, the Department failed to contact many of mother's extended family members. Although the Department spoke with mother and, early in the proceedings, with maternal grandmother, as well as with maternal aunt and uncle, it does not appear the Department contacted or attempted to contact any of mother's other siblings. There is no indication mother's siblings were difficult to locate. It was reported mother stayed in touch with her nine siblings and maternal grandmother, all of whom lived in Indiana. Under the Department's initial duty of inquiry, it should have contacted or, at the least, attempted to contact mother's extended family members including, for example, all of her siblings, to ask if the children may be Indian children. (Welf. & Inst. Code, § 224.2, subd. (b); 25 U.S.C. § 1903(2); Welf. & Inst. Code, § 224.1, subd. (c).) Thus, as with father, the Department failed to satisfy its initial duty of inquiry with respect to mother.

However, our analysis as to mother's side of the family does not stop there. Once mother and maternal grandmother indicated there might be Cherokee heritage on their side of the family, there was reason to believe Indian children might be involved, thus triggering the duty to make further inquiry "as soon as practicable." (§ 224.2, subd (e).) Consequently, the juvenile court and the Department were obligated to make further inquiries, including of those individuals they had already contacted, to gather information about mother's claimed heritage. Although the Department made some unsuccessful attempts at further inquiry years after learning of mother's claimed Indian heritage, the Department never tried to contact maternal grandmother again. Additionally, as already noted above, the Department never contacted the majority of mother's siblings. Moreover, it is unclear why the Department waited so long to attempt further inquiry of maternal family members when it could and should have done so years earlier.

Nonetheless, despite these missteps, we conclude the Department's 2018 notices were sufficient and adequate contact for purposes of the Department's obligation to make further inquiry after learning of mother's claimed Indian heritage; i.e., after having a reason to believe Indian children may be involved. The 2018 notices included names, birthdates, birth places, and addresses. They were received by the tribes and government agencies. Although information for the twins was not included in those notices (because they were not yet born), that is insignificant since it is not claimed that any one of the children is a member of a tribe. Because the children are all full biological siblings, if one is eligible to become a member of a tribe, so too would the others, and vice versa. Moreover, although on appeal

father lists various inaccuracies in the 2018 notices, perfection is not required and the listed inaccuracies were not prejudicial for purposes of further inquiry. (*In re D.F.* (2020) 55 Cal.App.5th 558, 570–571.) Because this case never became one in which there was reason to know an Indian Child was involved, formal notice to tribes was not required. (*Ibid.*)

Additionally, it was not necessary for the Department to re-notice the tribes or the government agencies prior to the permanency planning hearing. Because this was not a reason-to-know case and because the juvenile court previously had determined ICWA did not apply, the 2022 notices were not required. (§ 224.3, subd (b).) Thus, the obvious inadequacy of the 2022 notices was immaterial in that those notices were superfluous. To be clear, the 2022 notices were woefully insufficient. They included next to zero information, which is inexplicable given the Department had already compiled and used much of the family members' identifying information in the 2018 notices. One wonders why the 2022 notices were even sent. Nevertheless, the 2022 notices do not detract from the sufficiency of the 2018 notices, as discussed above.

Finally, it is significant that, in its response to the 2018 notices, the Eastern Band of Cherokee Indians declined to intervene in the case, stating the children were not considered Indian children. This, coupled with no responses from the other two noticed tribes and the fact that mother and maternal grandmother stated they were not members of any tribe, constitutes substantial evidence supporting the juvenile court's finding that ICWA did not apply. (25 U.S.C. § 1903(4); Welf. & Inst. Code, § 224.1, subd. (a).)

17

In closing, we note the older children have been waiting for permanency for over five years, and the twins since they were born.  Many of the children have lived most if not all of their lives outside the care of mother and father.  We are confident our decision aligns with the importance the dependency law rightly affords to the safety, well-being, and best interests of dependent children.

## DISPOSITION

The juvenile court's February 23, 2023 orders are affirmed.

NOT TO BE PUBLISHED.

LUI, P.J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.

18